2019 IL App (2d) 190639-U
No. 2-19-0639
Order filed December 16, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* N.G., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 19-JA-14 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Alyson G., | ) | Mary Linn Green, |
| Respondent-Appellant.) | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Burke and Bridges concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court did not err at the dispositional hearing by placing custody and guardianship of respondent's child, N.G., with the Department of Child and Family Services (DCFS). Respondent had a history of domestic violence linked with use of substances and was recommended for both domestic violence and substance abuse treatment, but had yet to begin either treatment at the time of the dispositional hearing. Also, respondent suffered from mental illness that was responsible for an incident of self-harm that resulted in the neglect petition. Respondent was undergoing outpatient treatment for her mental illness at the time of the dispositional hearing. Based on this evidence, the trial court's finding that respondent was unable to care for N.G. was not against the manifest weight of the evidence.

¶ 2     Respondent, Alyson G., appeals the dispositional order of the trial court (1) finding respondent unable, for other than financial reasons alone, to care for her child, N.G., (2) making

N.G. a ward of the court, and (3) placing guardianship and custody of N.G. with the Department of Children and Family Services (DCFS). Respondent argues that the trial court erred because the evidence at the dispositional hearing showed that she was complying with mandated services. We reject respondent's contention and affirm.

¶ 3                                    I. BACKGROUND

¶ 4      N.G. was born in June 2016. The State filed its neglect petition in January 2019, but, according to caseworker reports and testimony, DCFS had been involved with respondent since the fall of 2017. In September 2017, DCFS personnel were summoned regarding a domestic dispute at the Loves Park home that respondent was sharing with her boyfriend, Angus M. The altercation started when respondent accused her uncle of reporting her to DCFS. Respondent physically attacked the uncle, who, in defending himself, knocked her unconscious. Angus and respondent's brother then physically attacked the uncle, beating him with a baton. Respondent's father arrived and sought to take N.G., who was home during the incident. The father was intoxicated and became belligerent with the police. N.G. was placed instead with a party who is unnamed in the record. Respondent was arrested and charged with domestic battery. N.G. was eventually returned to respondent's care, where she remained until the July 2019 dispositional hearing in this case.

¶ 5      On the date of respondent's arrest, DCFS personnel observed that the floor of Angus M.'s home was "covered in trash." Clothes and other belongings were "piled up everywhere" and soiled diapers were "all over the floor." Small paths led to each room of the house. Animal feces was "all over [the] basement." N.G.'s face was covered with dirt.

¶ 6      In October 2017, DCFS opened an intact case on respondent and recommended services. The earliest case report in the record is dated June 7, 2018. The report states that respondent has

a history of mental illness including depression and anxiety. Respondent was prescribed psychotropic medication and was undergoing therapy. She was recommended for parenting services but had failed to schedule her intake assessment. Respondent had a "self-reported history of using substances" but refused to comply with random drug tests. She had also failed to take a substance abuse assessment. Respondent was showing "minimal compliance" with services since the case was opened in October 2017.

¶ 7    In December 2018, respondent engaged in an incident of self-harm. As described in caseworker reports and testimony, respondent deliberately stabbed herself in the stomach, purportedly to end an argument between family members. She was hospitalized for three days. N.G. was upstairs sleeping when the incident occurred.

¶ 8    In January 2019, the State filed a two-count neglect petition. Both counts alleged that N.G. was at risk of harm due to an injurious environment. Count 1 alleged that N.G. was residing in a home where there was a history of domestic violence, while count 2 alleged that respondent "engage[d] in self-harm requiring hospitalization" while N.G. was home.

¶ 9    Caseworker reports from January to March 2019 indicate that respondent was discharged from mental health counseling for lack of attendance. Respondent later claimed to have restarted counseling, but the caseworker was not able to confirm this. Respondent still had not taken a substance abuse assessment. Since the case was opened in October 2017, respondent had taken only two drug tests: the test in November 2017 was positive for marijuana, while the test in January 2019 was negative. Respondent had moved out of the home she shared with Angus M. and was residing with her father and brother.

¶ 10    On March 14, 2019, respondent was arraigned on the neglect petition. In its order entered on that date, the trial court directed DCFS to provide services to respondent.

¶ 11    On April 2, 2019, DCFS filed a service plan.  The caseworker noted that respondent has been diagnosed with post-traumatic stress syndrome, bipolar disorder, schizophrenia, and depression.  Respondent had a "history of aggression and domestic [violence] against her mother."  Respondent was no longer residing with Angus M. but had moved in with her father and brother in Durand.

¶ 12    The service plan recommended the following services:  (1) substance abuse assessment and any recommended treatment; (2) random drug testing; (3) mental health assessment and any recommended treatment; (4) parenting classes; and (5) protective daycare for N.G.[1]  For each service, the start date was identified as November 23, 2017 (the intact case was opened in October 2017), and the evaluation date as January 2, 2019.  Respondent's progress was rated as satisfactory only with respect to area (5).  Her progress in areas (1), (2), (3), and (4) was rated as unsatisfactory because she had taken only two drug tests since the case was initiated, she was discharged from mental health counseling for lack of attendance and only recently began counseling again, and she failed to begin parenting classes.

¶ 13    An integrated assessment filed in May 2019 noted that respondent has a "history of domestic violence incidents where alcohol has been involved and has tested positive for marijuana."  Two such incidents resulted in charges of domestic battery against respondent:  a June 2017 incident, and the September 2017 incident for which DCFS was summoned.

¶ 14    In an April 30, 2019, report to the court, the caseworker noted that respondent was continuing with her mental health counseling.  Since the March 14 arraignment, respondent had

---

[1]  The service plan also recommended that respondent "engage with Turning Points," but did not elaborate.  Explanation was provided in the April 30, 2019, report to the court.

taken two drug tests (one positive, one negative) but failed to appear for a third. She also failed to complete a substance abuse assessment; she claimed problems with her phone, conflicts with her work schedule, and a lack of transportation. "[D]ue to her history of provoking altercations with her previous paramour, as well as family members," respondent was recommended to complete an intake assessment for the Turning Points program for women with anger management issues. Respondent failed to complete the intake assessment, again citing her work schedule and lack of transportation.

¶ 15    On May 8, 2019, the trial court held a shelter-care hearing. Amy Pusakulich testified that she is an intact supervisor for Children's Home & Aid (CHA), which has a contract with DCFS to provide case management services. Pusakulich testified that respondent's original referral to CHA was based on her "mental health issues and potential substance abuse issues that were not being addressed." Respondent had "symptoms of highs and lows, some anxiety, depression." Respondent underwent a mental health assessment, based on which she was recommended for dialectical behavioral therapy (DBT), both individual and group. Pusakulich testified that respondent "needs a lot of help with her emotional regulation." Respondent's mental health issues were manifested in the incident of self-harm in December 2018, and they continue to pose a risk to N.G. Pusakulich characterized respondent's mental health issues as "untreated." She explained that respondent has been in DBT for two months and that the process takes about a year. Pusakulich acknowledged that respondent has "been doing what she needs to do with regards to mental health."

¶ 16    Pusakulich testified that respondent was also recommended to complete an intake assessment with Turning Points, which was "a 6-month program for women who have *** issues with maintaining emotional stability." The program teaches coping skills.

¶ 17    Pusakulich also noted that respondent still had not completed a substance abuse assessment. According to Pusakulich, there was no indication that the December 2018 incident of self-harm was linked to respondent's use of substances, but respondent did self-report that substance abuse was involved in her domestic violence incidents. Pusakulich admitted that the requirement of a substance abuse assessment and random drug testing was mostly precautionary. Pusakulich had never observed respondent under the influence of a substance or received a report from a caseworker claiming to have observed respondent under the influence. Pusakulich was concerned, however, by respondent's sporadic compliance with random drug tests. Respondent claimed that it was a hardship for her to travel to the drug tests, but Pusakulich noted that she provided respondent with gas cards and bus passes.

¶ 18    Pusakulich testified that respondent is currently employed and has to rely on child care. The service plan requires her to use protective daycare. Prior to her move to Durand, respondent was using protective daycare in Machesney Park. That facility is now a significant distance away and respondent has not used it, or any other daycare, for a month. Respondent relies instead on family. Pusakulich stated that, on a cursory review, she found no daycare centers in Durand, which is a small community, but she believed that there must be some appropriate care available there. She noted that a relative could become an approved provider but it would require an extensive process involving fingerprinting by the FBI.

¶ 19    Pusakulich stated that N.G. was on-target developmentally. Respondent's father and brother, with whom she was living, appeared to provide a good support system.

¶ 20    Josie Martinez testified that she was respondent's caseworker since October 2018. Martinez noted that respondent was consistently attending mental health counseling at Rosecrance

in Rockford one day a week. Rosecrance was about 45 minutes away from Durand, where respondent has been living for about two months.

¶ 21    Martinez testified that, though respondent was complying with the requirement of mental health treatment, she was "defiant[y] *** refus[ing]" to comply with other services. Since the filing of the neglect petition in January 2019, respondent completed three random drug tests, which were negative, but failed to show for a fourth. Respondent still had not completed her substance abuse assessment. Respondent claimed she was too busy and also that she lacked transportation. Respondent did not have her own car but relied on her father for rides. Martinez informed respondent that she could complete the substance abuse assessment at Rosecrance in Rockford where she was already receiving treatment. Martinez further noted that respondent could have completed the assessment while she was still living at Loves Park, which is closer to Rockford.

¶ 22    Martinez stated that respondent has not used her daycare provider in Machesney Park for about a month. Martinez admitted that she has not yet had a chance to provide respondent with gas cards.

¶ 23    Respondent testified that she currently lives in Durand with her father and brother. She works part-time at a gas station.

¶ 24    Respondent acknowledged that she was previously enrolled in mental health treatment but was discharged for missing one session. Respondent claimed that she missed the session due to emergency surgery. She has since reenrolled in treatment.

¶ 25    Respondent testified that she was informed in just the last couple of weeks that she was required to complete a substance abuse assessment. Respondent admitted using marijuana "a handful of times" but claimed she was now clean and sober. She denied ever having a substance abuse problem. She recently took three out of four random drug tests. She noted that she is

required to complete a test within 24 hours of notification. She missed the one test because she does not own a car and her father was working at the time and unavailable to drive her. Respondent also blamed a lack of transportation for her failure to complete the Turning Points intake assessment and to arrange protective daycare.

¶ 26 Respondent further testified that she was referred for a parenting program but was unable to commence it because the YWCA did not return her calls.

¶ 27 At the close of the evidence, the trial court declined the State's request for temporary custody of N.G. The court saw no immediate and urgent need to remove N.G. from respondent's custody. See ILCS 705 ILCS 405/2-10 (West 2018). First, the risk of domestic violence was diminished now that respondent was no longer living with a paramour. Second, while respondent self-reported past marijuana use, there was no evidence that she currently used marijuana or other substances.

¶ 28 The court caveated, however, that if the case were before it for a permanency review, the court would find that respondent had not shown reasonable efforts (see 750 ILCS 50/1(D)(m)(i) (West 2018)) because "there are things that *** still need to be done." Respondent is "doing some things, but we're not at that point." The court further noted that "services have to be done," and that "[w]e have to be assured that before we close this case we have a nice, safe environment."

¶ 29 In its order continuing the case for adjudication of the neglect petition, the trial court appointed a CASA (court appointed special advocate) representative for N.G.'s benefit. The court also directed respondent to comply with services required by DCFS.

¶ 30 On June 6, 2019, the court held an adjudication hearing. Respondent stipulated to count 2 (respondent's self-harm) of the neglect petition. The State dismissed count 1 of the petition with respondent's agreement to complete services on that count. The State remarked that the parties

had no agreement as to disposition and wished the court to set a dispositional hearing. Counsel for respondent then commented:

> "That is the agreement, your Honor. And we do agree to the 30-day disposition date so that [respondent] can complete a couple of the assessments. She is in counseling, working, has a car now, doing her DBT. *** [She] plans to do the walk-in at Rosecrance assessment for substance abuse tomorrow and has a scheduled appointment for the Turning Points Program on June 18th at 8:00 in the morning. I'd anticipate that it should be a short time for disposition."

The court set the dispositional hearing for July 15.

¶ 31    In a July 15 report to the court, the caseworker noted that respondent was still employed and still residing with her father and brother. On June 18, respondent completed her intake assessment with Turning Points and was identified as a secondary aggressor. The caseworker noted that respondent had still not completed her substance abuse assessment. Respondent was required to complete that assessment before being assigned to a Turning Points group. The caseworker noted that respondent had completed paperwork for protective daycare in Davis and was simply waiting for the daycare to return their portion of the paperwork to the caseworker.

¶ 32    At the outset of the dispositional hearing on July 15, the State remarked that, contrary to the July 15 report, respondent had indeed completed her substance abuse assessment and was recommended for intensive outpatient treatment. Respondent completed the assessment on July 12—three days before the hearing.

¶ 33    Susan Kraft of CHA testified that she succeeded Josie Martinez as caseworker for N.G. Kraft confirmed that an intact case on respondent was opened in 2017. Early in the case, respondent was recommended for mental health treatment. Respondent began treatment but was

discharged for lack of attendance. Several months ago, she began DBT treatment and was having no attendance issues.

¶ 34    Kraft testified that respondent was identified through the Turning Points assessment as a secondary aggressor. She was not able to begin the Turning Points treatment until she completed her substance abuse assessment. Respondent completed that assessment on July 12, though she was recommended for it in January 2019. Kraft anticipated that respondent's drug treatment program would require her to attend several days a week.

¶ 35    Kraft testified that respondent's service plan also required her to take random drug tests. She failed to appear for some of the tests. To Kraft's knowledge, "there was one [test] that was positive and *** several that were negative."

¶ 36    Kraft was asked, "So exactly what services, other than continuing to participate in DBT, has [respondent] completed to ensure [that N.G.] is safe in the home?" She answered, "Nothing that I am aware of."

¶ 37    Kraft testified that respondent had made arrangements for protective daycare and was simply waiting for the daycare to return their portion of the paperwork. Respondent now had her own car but claimed during Kraft's last home visit that the car had been inoperative for a time. Kraft noted that, during the home visits, the residence appeared clean and safe. Respondent interacted appropriately with N.G. and they appeared to have a mutual bond. Respondent's father and brother seem supportive of respondent. Respondent has been communicative and cooperative with Kraft. Kraft was not, at this time, recommending removal of N.G. from respondent's custody.

¶ 38    Respondent admitted in her testimony that she was unsuccessfully discharged from two prior mental health programs. She began treatment again in approximately March 2019. She undergoes three hours of therapy per week.

¶ 39    Respondent claimed that it was only after she "started court in March" that she was asked to complete a substance abuse assessment. Respondent was unable to complete the assessment before July 12 because she lacked transportation. She acquired her own car about a month ago. Before this, she had to rely on her father for rides or use taxis.

¶ 40    Respondent admitted that she tested positive for marijuana about two months ago. She tried marijuana in the past but it made her sick. She "can't smoke."

¶ 41    Respondent testified that her mother and father watch N.G. when respondent is away. She has enrolled N.G. in daycare and is waiting for the paperwork to finalize. Respondent claimed that she was willing to complete any required services.

¶ 42    At the close of the evidence, both the State and the CASA worker argued for removal of N.G. The trial court agreed that removal was appropriate, explaining as follows:

    "[U]p until now this child has been living with [respondent]. When we sit down and analyze the issues that still have to be looked at, [the] services that are needed are substance abuse services. Now, I have heard perhaps the intensive outpatient program, but we know that there are substance abuse services that need to be gotten. The DB[2] issues, there are services that are needed in that area. The mental health issues, I think she has been receiving the DBT services, and I think that she is going to be continuing those services.

    There is no way that I can find [respondent] unwilling. There just isn't.

    I think until she receives the other two out of three areas of services she's not able. And I have to find that as a legal finding. It's got nothing to do with [respondent] being

_____

    [2] As the trial court meant to identify three areas of services, we presume that the court meant "D*V*," for domestic violence.

willing or unwilling. So until [respondent] gets those services I have to find that she is unable.

So I'm going to have to give guardianship and custody to [DCFS].

\*\*\*

\*\*\* I think that it's a good thing that [respondent] has been having the DBT. I think that it is a good thing that she has gotten the assessment for substance abuse so we can get those things going. I think that it's great that [she] found a protective daycare. \*\*\* [W]e are not quite half there yet, but keep [it] up, and you are heading in the right direction. Okay. I'm sorry that it has taken this long to head that direction but it seems to have."

¶ 43    The court entered an order making N.G. a ward of the court and granting custody and guardianship to DCFS. The court required respondent to complete drug, alcohol, and psychological treatment services as required by DCFS.

¶ 44    Respondent filed this timely appeal.

¶ 45                                  II. ANALYSIS

¶ 46    Respondent challenges the trial court's dispositional order making N.G. a ward of the court and finding respondent unable to care for her.

¶ 47    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) provides a step-by-step process for deciding whether a child should be removed from his or her parents and made a ward of the court. Following the filing of a neglect petition, the trial court holds a temporary custody hearing to determine whether an urgent need exists to remove the child from the home. See 705 ILCS 405/2-10 (West 2018). After deciding the matter of temporary custody, the court holds an adjudicatory hearing to determine if the child is abused, neglected, or dependent. See 705 ILCS 405/2-18 (West 2018). If there is a finding of abuse, neglect, or dependence, the trial

court holds a dispositional hearing to determine "whether it is in the best interests of the minor and the public that he or she be made a ward of the court," and, if so, which disposition will "best serv[e] the health, safety and interest of the minor and the public." 705 ILCS 405/2-22(1) (West 2018). At the dispositional hearing, the court

> "shall consider the permanency goal set for the minor, the nature of the service plan for the minor and the services delivered and to be delivered under the plan. All evidence helpful in determining these questions, including oral and written reports, may be admitted and may be relied upon[.]" *Id.*

¶ 48    The trial court may choose, as its disposition, to remove the minor from the custody of the parents if the court finds that the parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian[.]" 705 ILCS 405/2-27(1) (West 2018).

¶ 49    At the dispositional hearing, the State bears the burden of proving parental unfitness, inability, or unwillingness by a preponderance of the evidence. *In re K.B.*, 2012 IL App (3d) 110655, ¶ 22. The reviewing court will not upset a trial court's dispositional determination unless its factual findings are against the manifest weight of the evidence or it commits an abuse of discretion by selecting an inappropriate disposition. *In re L.O.*, 2016 IL App (3d) 150083, ¶ 17. The trial court's factual findings are against the manifest weight of the evidence when the opposite conclusion is clearly evident. *In re A.F.*, 2012 IL App (2d) 111079, ¶ 40. A trial court has abused its discretion where no reasonable person would take the view adopted by the trial court. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). "Because cases under the Juvenile Court Act

are *sui generis* and must be decided on the basis of their unique facts, this court gives great deference to the trial court's determinations at the dispositional hearing, given that the court is in the best position to observe the demeanor of the witnesses and the parties, assess credibility, and weigh the evidence presented. *In re Jay H.*, 395 Ill. App. 3d 1063, 1070 (2009)

¶ 50 Respondent's first of two points on appeal is that the trial court's factual finding that she was unable to care for and protect N.G. was against the manifest weight of the evidence. Respondent suggests that she "was doing exactly what had been requested of her in the adjudication order of June 6, 2013," namely "[s]he was completing services that the judge had outlined in her ruling." She had also "addressed the domestic violence issue in Count I of the neglect petition when she moved out of the house where the violence had occurred and into the home of her father."

¶ 51 The trial court's concern at the dispositional hearing was that, though respondent had taken all required assessments, she had yet to begin all treatment recommended in those assessments. The court identified three areas of concern: mental health, substance abuse, and domestic violence. The court was pleased that respondent was receiving mental health treatment. The court remarked, however, that respondent also "need[ed]" services in the remaining two areas, and because she had not begun those services, the court could not find that she was able to care for and protect N.G.

¶ 52 The court's findings were well-founded. First, on the issue of domestic violence, we note that DCFS first became involved in this case after an ugly domestic incident at the home of respondent's boyfriend. Respondent had physically attacked her uncle, who then knocked her unconscious and was in return beaten with a baton by respondent's boyfriend and brother. Respondent was charged with domestic battery based on the incident. Case documents noted that respondent had a history of alcohol-related incidents of domestic violence and had an earlier charge

of domestic battery from June 2017. Respondent was referred for a domestic violence assessment at Turning Points based on her "history of provoking altercations with her previous paramour, as well as family members." She completed the assessment and was identified as a secondary aggressor. As of the dispositional hearing, respondent had not yet begun the program. We note that respondent's relocation from her boyfriend's home did not eliminate the potential for domestic violence, as she had a history of provoking quarrels with family as well as her paramour, and, at the time of the dispositional hearing, she was living with family. In our view, the trial court was justified in determining that respondent should not retain custody of N.G. while her recently assessed potential for domestic violence remained untreated.

¶ 53    The second area of concern for the trial court was substance abuse. The trial court's concern was appropriate in view of the reported link between respondent's use of substances and her incidents of domestic violence. Respondent was recommended for a substance abuse assessment while her case was still an intact case, from October 2017 to December 2018. Respondent did not complete an assessment during that period. Once the case came into court in January 2019, the assessment became part of respondent's mandated services. However, respondent did not complete the assessment until July 12, 2019—three days before the dispositional hearing. She was recommended for intensive outpatient therapy. Respondent gave no plausible reason for her failure to take the assessment for nearly two years after it was first recommended. Notably, respondent's caseworker offered her the opportunity to take the assessment at the Rosecrance facility in Rockford where she was undergoing weekly mental health treatment. Respondent's delay in taking the substance abuse assessment appears to have delayed

the commencement of her domestic violence treatment.[3] In our view, the trial court was warranted in placing custody of N.G. with DCFS while respondent addressed the substance abuse issues that were identified by an assessment that, due to respondent's intransigence, was not completed until the 11th hour, *i.e.*, three days before the dispositional hearing.

¶ 54    Additionally, while the trial court appeared satisfied with respondent's progress in mental health treatment, we must recognize Pusakulich's concern at the May 2019 shelter-care hearing with respondent's emotional instability and its connection to the alarming incident of self-harm in December 2018 that prompted the neglect petition (respondent stipulated to the incident at the June 2019 adjudication hearing). Respondent was previously in mental health treatment but was discharged for lack of attendance. By the time of the April 2019 service plan, respondent had begun treatment again. At the May 2019 hearing, Pusakulich testified that she considered respondent's mental health issues "untreated" because she had completed only two months of what Pusakulich anticipated would be a year-long DBT program. Pusakulich's testimony at the May 2019 hearing was unrebutted. Though the trial court found no urgency for taking N.G. into custody in May 2019, the court recognized the need for respondent to make further progress in services. As of the dispositional hearing in July 2019, respondent was about four months into her DBT treatment. In our view, respondent's obviously severe mental illness provided additional support for the removal of N.G. from respondent's custody.

---

[3] The State asserts that respondent would not be able to start her domestic violence treatment "until she completed her substance abuse *treatment*" (emphasis added). The State misreads the record; Kraft testified that respondent needed to complete her substance abuse *assessment* before beginning the domestic violence treatment.

¶ 55    For these reasons, we conclude that the trial court's factual findings in support of its dispositional order were not against the manifest weight of the evidence.

¶ 56    Respondent's second contention on appeal is that the trial court abused its discretion in making N.G. a ward of the court. "[T]he wardship determination is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life," including the parent's ability to care for the child. *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15; see also 705 ILCS 405/2-22(1) (West 2018). Respondent's challenge to the wardship determination does not invoke any consideration aside from her capacity to parent N.G. Therefore, this contention is redundant to her first contention on appeal, and we need not address it separately.

¶ 57                          III. CONCLUSION

¶ 58    For the following reasons, we affirm the judgment of the circuit court of Winnebago County.

¶ 59    Affirmed.